George PEKAR, Joseph Rozell, Edward Patterson, John Audia, Melvin Gower and Robert Schmantowski, individually and in behalf of all other employees of Goebel Brewing Company who worked at Plant No. 3 of said Company prior to the closing thereof, Plaintiffs,

v.

.LOCAL UNION NOS. 3, 38 AND 181 OF THE INTERNATIONAL UNION OF UNITED BREWERY, FLOUR, CEREAL, SOFT DRINK AND DISTILLERY WORKERS OF AMERICA, AFL–CIO, and International Union of United Brewery, Flour, Cereal, Soft Drink and Distillery Workers of America, AFL–CIO, Defendants.

Civ. A. No. 18940.

United States District Court
E. D. Michigan, S. D.

July 5, 1961.

Dee Edwards, Detroit, Mich., for plaintiffs.

Livingston & Keith, Winston Livingston, Detroit, Mich., for Local Unions.

James C. Paradise, Cincinnati, Ohio, for International.

THORNTON, District Judge.

This class action is brought under the provisions of 28 U.S.C.A. § 2201, as amended, and 29 U.S.C.A. § 157 by certain employees of Goebel Brewing Company, a Michigan corporation engaged in interstate commerce. Plaintiffs are members of Local Union Nos. 3, 38 and 181 of the International Union of United Brewery, Flour, Cereal, Soft Drink

and Distillery Workers of America, AFL-CIO, as well as members of the International Union, a voluntary association of persons employed in the brewing industry. It is alleged that on or about October 10, 1958, the said Goebel Brewing Company laid off all of the plaintiff employees who had been working at Plant No. 3, without regard to their seniority rights and in violation of the provisions of a collective bargaining agreement executed in May 1958 between the aforementioned locals (including the International) and the Goebel Brewing Company. The plaintiffs further allege that they promptly filed a grievance over the layoffs with the defendant locals, and requested that the defendants take immediate action to process the same, and to obtain their immediate recall to employment with Goebel, and further requested that the defendants protect and enforce the seniority rights acquired by the plaintiffs. It is the further claim of the plaintiffs that the defendants refused and neglected to present this grievance to the employer; failed and neglected to process the same, and to represent them fairly and equally but, on the contrary, have shown partiality and favor toward persons still employed by Goebel, all of which caused great expense and loss to the plaintiffs. Alternatively, the plaintiffs allege that the collective bargaining agreement of May 1958 was not intended to, and did not, cover the situation created by the present conduct of the company in laying off plaintiffs and closing Plant No. 3; that the defendants have failed, refused and neglected to negotiate a new agreement to resolve the problems created by the said closing of Plant No. 3, which would fully and fairly reflect all rights and claims to the remaining jobs available at Goebel Brewing Company; that the plaintiffs have made numerous efforts to persuade the defendants, and each of them, to consider their claims and requests, and to review the matter with them, but that the defendants have consistently refused to recognize that they owe any duties to plaintiffs, or that plaintiffs have any rights in the premises. Plaintiffs ask that the Court grant the following relief:

"A. Render and issue a declaratory judgment defining and determining

"(1) whether the existing collective bargaining agreement, entered into May 22, 1958, is applicable to the existing situation; and

"(2) if it is, render and issue a declaratory judgment defining and determining plaintiffs' rights in the premises; and

"(3) that the court enjoin and restrain defendants, and each of them, from refusing to process plaintiffs' grievances with reference to their wrongful lay-off; and

"(4) if said agreement of May 22, 1958, is not applicable to the present situation, restrain and enjoin the defendants, and each of them, from failing, refusing and neglecting to negotiate another agreement with the Goebel Brewing Company, which will fully and fairly reflect all the rights and claims of all employees to the remaining available jobs, based upon relevant factors.

"B. That plaintiffs may have specific performance of the duty of defendants, and each of them, to enforce and protect their seniority rights under the existing agreement, including, but not limited to, the invocation of the processes of negotiation, arbitration, economic force, or available judicial remedies.

"C. That defendants, and each of them, may be restrained and enjoined from preferring charges against plaintiffs, or any of them, within the union, based upon their bringing this or any other legal action to enforce their rights under the Constitution and laws of the United States in the State of Michigan and the Constitution and by-

laws of defendants, during the pendency of this action, or thereafter.

"D. That plaintiffs, and each of them, may be made whole for any and all damages suffered by reason of the wrongful acts of defendants, to the date of trial hereof.

"E. That plaintiffs may have such other and further relief as may be proper and just."

## Findings of Fact.

1. The agreement of May 22, 1958 (Exhibit I) was entered into between the Breweries of Detroit, Michigan, as employer, and Brewery Workers' Local Union Nos. 3, 38 and 181 and the International Union of United Brewery, Flour, Cereal, Soft Drink and Distillery Workers of America, the locals and the International being the collective bargaining agents as provided for by Exhibit I.

2. Local 181 had jurisdiction of the bottlers in plants owned and operated by Goebel, and also of the bottlers in all other breweries in the Detroit Area.

3. Service of process was never effected as to Local 38; at the close of the plaintiffs' case, Local 3 was dismissed; therefore the remaining parties are the plaintiffs, Local 181 and the International Union.

4. During the year 1948 the Goebel Brewing Company extended its operations by opening up as Plant No. 3 a brewery that Goebel had taken over from Koppitch-Melchor in Detroit. Many employees at Plant No. 1 of the Goebel Brewing Company were transferred to Plant No. 3 of Goebel when it commenced operation at Plant No. 3. From the time that Goebel commenced operating Plant No. 3 it established and kept a separate seniority list for Plant No. 3 as it applied to all members of Local 181 working at Plant No. 3. The result was that Plant No. 1 and Plant No. 3 each had its own seniority list and status, the employees of each plant thereby having plant-wide rather than company-wide seniority for layoff and rehiring or recall purposes.

5. Seniority lists were posted at Plant No. 3 and at Plant No. 1. The employees on one list could not "bump" employees for job preference on the other list, with the result that in transferring from one plant to another, in either direction, an employee did not carry his seniority to his transferred status, but went to the bottom of the seniority list at the time of such transfer.

6. The employees of Goebel in the category known as "checkers", who were members of Local 181, had company-wide seniority with Goebel by virtue of special contract arrangements.

7. After Plant No. 3 was in operation, there were shutdowns during certain slack periods in each of Goebel's plants, but there was no evidence of any "bumping" by the employees of the plant that was shut down. With the exception of these seasonal shutdowns in both plants, the work in each plant was steady for the great majority of the employees, with the result that the question as to plant-wide or company-wide seniority was not a matter of apparent concern or controversy, either union-wise or employer-wise, until an extended layoff in 1955 at Plant No. 3.

8. In October 1958 the employees at Plant No. 3 were told that the company was going to terminate production at that plant; and on the day of this notice the men at Plant No. 3 were told that they could not go to Plant No. 1 for work even though there were employees of Plant No. 1 with less seniority than some of the men being laid off at Plant No. 3.

9. After the layoff at Plant No. 3 the men contacted the National Labor Relations Board and were advised by that agency to see management; management advised that if the Plant No. 3 employees were absorbed by Plant No. 1, according to their date of hiring seniority then there would be trouble at Plant No. 1.

10. The Plant No. 3 group of employees then submitted their seniority grievance to Local 181 but obtained no relief; then to the International with the same negative result. They thereafter instituted the within action. The defendants do not contest the fact that the plaintiffs have exhausted any and all remedies available to them within the framework of their Local Union and of the International Union.

11. During the year 1955 when Plant No. 3 had been shut down for an extended period of time, there was a discussion about seniority within Local Union No. 181 as to whether or not the employees at Plant No. 3 were invested with plant-wide or company-wide seniority. During this layoff employees from Plant No. 3 went to work at Plant No. 1 but they were placed at the bottom of the seniority list at Plant No. 1, and they protested this treatment of their seniority status.

12. When Plant No. 3 was reopened the Plant No. 3 employees working at Plant No. 1 were asked if they wanted to remain at Plant No. 1 or return to Plant No. 3. Since Plant No. 3 was modernized during the shutdown they felt that it would remain open permanently so they returned to Plant No. 3 and assumed their regular Plant No. 3 seniority.

13. Exhibit No. I, Section 6, page 19, provides as follows:

"Employees shall have preference of shift in accordance with seniority (length of service with the Employer) subject to the following conditions: * * *."

The foregoing preference was granted separately in each plant, with the result that an employee in Plant No. 3 could not avail himself of this preference in Plant No. 1. The converse of this was also true, with the result that during the time that both plants were in operation the employees in the two plants never attempted to interchange shift allotments.

14. After the layoff in 1955, while Plant No. 3 was being modernized, the seniority status of the members of Local 181 employed at Plant No. 3 became a matter of concern and controversy within the union. A legal opinion from the General Counsel of the International was forwarded to Mr. Peter Hann, Business Representative and Corresponding Secretary of Local 181, regarding the question of the seniority rights of members of Local 181 at Plant No. 3 (here as Exhibit 41) wherein the following three questions were considered:

"1. Are the seniority rights of the employees of the Goebel Brewing Company to be exercised on a separate plant basis or on a company-wide basis?

"2. May a laid off employee in Plant 3 assert company seniority in Plant 1 for the purpose of bumping an employee with less seniority out of a job?

"3. Would an employee laid off in Plant 3 who might be hired in Plant 1 be able to assert his company seniority and take a higher place on the seniority list of Plant 1 than a present employee in that plant?"

As to question 1, the General Counsel concluded, in substance, that it seemed clear to him that it had never been the intention of either the company or the union to establish company-wide seniority. As to question 2, he concluded, in substance, that a laid-off employee of Plant No. 3 had no right to bump an employee with less seniority at Plant No. 1, and that the same would be true of an employee of Plant No. 1 attempting to bump an employee in Plant No. 3. As to question 3, he concluded, in substance, that it was his opinion that this question would definitely have to be answered in the negative. He further stated that since seniority was on a plant by plant basis, a Plant No. 3 employee who would transfer to Plant No. 1 would go to the bottom of the

seniority list, and the same would be true of a Plant No. 1 employee transferring to Plant No. 3. This opinion from the General Counsel was submitted to the general membership of the Local, (as was customary with all legal opinions received by Local 181) at a meeting held on February 5, 1956, was discussed by the members present and approved.

15. When a new contract was to be negotiated between Locals 3, 38 and 181 and the International, on the one hand, and the Brewers located in and about greater Detroit, on the other, the local unions would select representatives from each of the local breweries to participate in the negotiations. This included a representative from Plant No. 1 and a representative from Plant No. 3. There was a committee known as a contract committee made up of members of Local 181, who would assemble the proposals for submission at the bargaining sessions at negotiation time, for the guidance of the representatives of the local unions who were selected to participate with the company in the actual negotiations of the new contract.

16. In relation to the negotiation of the 1958 agreement (Exhibit I), the first meeting of the proposal committee was held during the fall of 1957, at which time the seniority rights of the employees of the two Goebel plants were discussed pro and con. At another meeting of the contract committee held on January 25, 1958, "the problem of one or two seniority lists for Goebel employees at Goe No. 1 and Goe No. 3, was again brought up and discussed, and it was thought that it be left as is, because a vote at this time (January 1958) would not be fair to all concerned. There are over 200 employees at Goe No. 1—80 employees at Goe No. 3. And since this separate seniority list has already been in practice, for the last 10 years, that it remain as is.". (Exhibit 65–A). The proposals agreed upon by the contract committee were submitted to the general membership of Local 181 for ratification, then to the Joint Executive Board for endorsement, and then to the International Union for its attention.

17. At the time that proposals were being submitted and considered, it was a matter of common knowledge to the officials of Local 181 that the Plant No. 3 employees were contending that there was company-wide seniority at the Goebel Brewing Company. Local 181 never asked or considered asking the Goebel Brewing Company to do anything about seniority rights of its employees. The Local's position was that the employees of Plant No. 3 had no seniority rights at Plant No. 1, and the Local further felt that it was not its duty to try to reopen the contract to change the seniority rights of the respective employees. In adopting this procedure it relied upon paragraph 193, page 43 of Exhibit I (the agreement) which reads as follows:

"A list of employees arranged in the order of their seniority, shall be revised and posted March 1st and September 1st of each year. A copy of the seniority list shall be furnished the Local Union."

and in conjunction with the foregoing relied upon section 5, page 42 of Exhibit I, as modified by Exhibit 47, which reads:

"There shall be a seniority list for Stroh checkers and a seniority list for Goebel checkers for plant 1 and plant 3 that shall be strictly used to determine layoffs and recalls in the checking department only."

At the time of the shutdown of Plant No. 3 there were employees still working at Plant No. 1 with less company-wide seniority than that held by the employees laid off at Plant No. 3.

### Conclusions of Law.

■ ■ 1. A study of the agreement of May 22, 1958 (Exhibit I), reveals that the distinction between plant-wide and company-wide seniority is not

spelled out as such in said agreement. This fact does not, however, indicate the existence of an ambiguity. Ambiguity is an "ambiguousness in meaning arising from language admitting of more than one interpretation; duplexity in meaning." (Webster's New International, Second Edition). Bouvier's Law Dictionary (Rawle's Third Revision) defines ambiguity as "duplicity, indistinctness or uncertainty of meaning of an expression used in a written instrument." The totality of the language in the said agreement relating to seniority in each and every particular permits of no ready interpretation other than that of company-wide seniority. Defendants have pointed to no provision which is clearly construable as referring to plant-wide seniority rather than to company-wide seniority. We therefore conclude that the intendment of the agreement and the implications to be drawn from the language therein are entirely consistent with company-wide seniority.

2. Whether or not defendants deliberately discriminated against, or intended to discriminate against, the plaintiffs is immaterial for purposes of the resultant effect upon plaintiffs. We conclude that there was a breach of the duty of fair representation which resulted in a type of injury to the plaintiffs against which they were entitled to have been protected by virtue of the terms of Exhibit I.

3. The fact that plaintiffs made no complaints prior to 1955, under the circumstances as they existed in this case, is no reason for their having been precluded from attempting to assert the rights to which they were entitled under Exhibit I. The various situations which arose in relation to seniority rights were of such nature that it would have served no practical purpose for plaintiffs to have raised the issue of company-wide seniority versus plant-wide seniority. Generally speaking, at various times when there were layoffs, they were parallel as between the two plants so that it would have

availed plaintiffs nothing to have had recognition of company-wide seniority rather than plant-wide seniority.

4. We find no merit in the defendants' contention that it was incumbent upon plaintiffs to have asserted and insisted upon company-wide seniority during periods, prior to 1955 when there was, in fact, no possible objective for doing so.

5. Neither is there any merit to defendants' theory that plaintiffs' conduct of nonassertion and noninsistence was tantamount or akin to waiver or release of their contract right to company-wide seniority. Absent such intention on the part of plaintiffs they cannot be held to having relinquished a valuable contract right. The theory of waiver has always embraced the concept of intentional purpose. There can be no waiver without the plaintiffs having so intended.

6. Just the opposite is true, however, in the area of the discrimination here practised upon plaintiffs. It was practised upon them regardless of intent one way or the other on the part of defendants. Plaintiffs have suffered ultimate discrimination just as much by the allegedly good intentions of defendants as if the defendants had acted willfully and maliciously.

7. Plaintiffs had a right, and a *continuing* one, to rely upon the terms of the agreement (Exhibit I) for so long as such agreement was in force and effect. There being no valid modification of said agreement with respect to the issues here raised, plaintiffs were entitled to recognition of company-wide seniority.

8. We disregard the various acts and procedures alleged by the defendants to have constituted a course of conduct which had the effect of interpreting the agreement (Exhibit I) as providing for plant-wide seniority. The contract, not being ambiguous, no reliance upon acts and conduct in construction thereof is necessary or allow-

able in an effort to resolve nonexistent ambiguities.

"No verbal understanding or representations of any nature that would change the meaning of any section of this Agreement will be recognized or considered valid and no Union representative or Employer representative shall have the authority to change any provisions of this Agreement." Exhibit I, Section 4, page 60.

An appropriate judgment or decree may be presented on notice, Reserving, however, the question of damages until determination thereof be made pursuant to the stipulation of record as entered into by the parties during the progress of the trial herein.